Filed 5/21/21  P. v. Grimes CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E071594 |
| v. | (Super.Ct.No. FELJS1600148) |
| MICHAEL GRIMES, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Lorenzo R. Balderrama, Judge.  Reversed and remanded with directions.

Ron Boyer, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, and Michael Pulos and Joy Utomi, Deputy Attorneys General, for Plaintiff and Respondent.

In 1989, defendant Michael Grimes confessed to sexually abusing his three daughters.  He pleaded guilty to two counts of a forcible lewd act on a child and was

1

sentenced to prison. In 2002, two neighbor girls disclosed that he had sexually abused them. He pleaded no contest to three counts of a nonforcible lewd act on a child and was sentenced to prison again. In this proceeding, a jury found defendant to be a sexually violent predator (SVP); he was committed indefinitely for treatment.

Defendant appeals. His numerous contentions fall into four general categories: (1) his 1989 confession would have been inadmissible in a proceeding to extend the commitment of a person found "not guilty by reason of insanity" (NGI), and therefore it was an equal protection violation to admit it in an SVP proceeding, unless the People provided a constitutional justification for the distinction; (2) the Sexually Violent Predator Act (SVPA or Act) is unconstitutional; (3) there was insufficient evidence of various elements of the definition of an SVP; (4) and the trial court erred by denying a requested instruction.

On the authority of *People v. McKee* (2010) 47 Cal.4th 1172, we are compelled to agree that, on this record, it was an equal protection violation to admit defendant's confession. The appropriate appellate remedy is to remand conditionally, to give the People an opportunity to demonstrate that the distinction between NGIs and SVPs is necessary to further a compelling state interest. We also address defendant's contention that the Act is unconstitutional, because, if it is, there would be no need for a remand and he could not be retried. However, we reject defendant's various arguments on this point.

We address defendant's other contentions, as well, because, if they were well-taken, he would have to be retried. However, we reject these, too. Accordingly, if the

2

trial court concludes on remand that the distinction between NGIs and SVPs is constitutional, it must reinstate the judgment; otherwise, it must hold a new trial.

I

STATEMENT OF FACTS

A.     *Defendant's Criminal Record.*

1.     *1989 conviction.*

Defendant had three daughters — K., D., and C.  Because of his "violent temper reactions," his wife and children were afraid of him.  He "beat [his] wife."  He disciplined his daughters by spanking them, by hand, with a belt, or with a paddle, and by slapping their faces.  He also threatened his daughters, telling them, "[Y]ou don't have to fear the police because they can only kill you, I'm the one you really have to fear."

Around 1984, defendant started sexually abusing his daughters.  At that time, K. was nine or ten, D. was seven or eight, and C. was five or six.  He made all three of them undress.  He made K. orally copulate him; he also made the other two "lick it," so "nobody can rat on nobody."

He had sex with his wife once a day and a daughter once a day.  His daughters orally copulated him daily for a couple of months, so "probably . . . less than . . . 100 times."  He also orally copulated them.  He digitally penetrated C. and K.  He took photos of them naked, with their legs spread.  He "tried to stay away from D[.]," because she had a learning disability.  Nevertheless, on occasion, he performed sexual acts with all three girls at once.

3

He threatened them that if their mother found out, "she ain't going to love you no more, there's going to be a big fight, daddy goes to jail." He regularly threatened to kill C. and her whole family if she told.

Sometimes, his daughters asked him to stop. He later said, "When they say no, I did my best to stop," "[b]ut it's very, very difficult without the right help." "I could not stop it myself, so I asked them to stop me from doing it."

In 1989, defendant was arrested. He gave the police a confession, which was read to the jury in this case.

In it, he explained, "I started . . . just for blow jobs because my wife wouldn't give me one." "[It n]ever occurred to me that I was affecting them mentally." He knew what he was doing was illegal, but he felt it was not morally wrong. In his view, "the head of the household controls the family and make[s] the moral rules."

Defendant said he had moved out of Georgia because sex with children "was a way of life in Georgia." "In Georgia, it's right, they always do it. . . . I think that's where I got the idea it was okay." Once, when he was in Georgia, he asked to see his wife's eight-year-old sister's genitals; she showed him.

Defendant entered into a plea bargain pursuant to which he pleaded guilty to two counts of a forcible lewd act on a child, involving C. only. Other counts involving the two older sisters were dropped. In 1990, he was sentenced to 16 years in prison.

4

In 1997, he was released on parole. Two days later, he violated his parole by failing to report to his parole officer, because he planned to commit suicide. His parole was revoked and he was hospitalized.

2. *2002 conviction.*

In 1998, defendant was released again. As a registered sex offender, he was not supposed to interact with children. Nevertheless, in 2002, he sexually abused two sisters, R., aged 12, and H., aged 10, who lived in his apartment complex.

According to R., defendant touched her breasts and buttocks, over her clothing. About two weeks later, he grabbed her, rubbed her buttocks, then rubbed her vagina.

According to H., defendant rubbed his body against her, then touched her breasts and buttocks. "[H]e threatened to kill [H.] and her sister if she told anyone."

R. had previously been sexually abused by her father. The father had then murdered the girls' mother, in front of H. Thus, the girls lived with their maternal grandmother. After defendant moved out, the grandmother looked up all the known pedophiles in her zip code and discovered that defendant was a pedophile. She therefore asked the girls if someone had touched them. In response, they disclosed the sexual abuse by defendant.

The girls' initial statements to their grandmother and to the police were inconsistent, in some respects, with their statements in subsequent forensic interviews. Also, in 2016, R. gave a statement to an investigator that was inconsistent, in some respects, with her statements in 2002.

5

In 2004, defendant pleaded no contest to three counts of a nonforcible lewd act on a child and was sentenced to 15 years in prison. In 2016, he was released from prison and committed to Coalinga State Hospital.

B.     *Expert Testimony*.

1.     *General accepted methodology*.

As expert witnesses, the prosecution called Michelle Vorwerk and Dr. Robert Brook. The defense called Dr. Lisa Jeko and Dr. Carolyn Murphy. All four were psychologists and experienced SVP evaluators.

All four experts agreed that defendant had Pedophilic Disorder. Three of them agreed that he also had Antisocial Personality Disorder; Dr. Murphy, however, believed that he had Adjustment Disorder instead.

In evaluating defendant's risk of reoffending, all four experts used the Static-99R. The Static-99R is "the most commonly used actuarial[,] empirical . . . tool used" to determine a sex offender's risk of reoffending. It looks only at "static" risk factors — i.e., immutable factors, such as the subject's past offenses and history of nonsexual violence.

The Static-99R was developed by looking at a large group of sex offenders and determining what those who reoffended tended to have in common. Several different "norms" had been developed by applying the Static-99R to different sample groups. These included the "routine" group and the "high-risk/high-needs" group. The high-

6

risk/high-needs group had a smaller sample size. Moreover, it did not include any offenders in the United States.

All of the experts agreed that defendant's score on the Static-99R was 0, which indicated "below average" risk.

In the routine group, a score of zero indicated that the risk of reoffending within five years was 2.8 percent. The 95 percent confidence interval was from 2.2 to 3.5 percent.

In the high-risk/high-needs group, a score of zero meant a 7.2 percent chance of reoffending within five years; the 95 percent confidence interval was from 4.7 to 10.7 percent. It also meant a 13 percent chance of reoffending within ten years, with a 95 percent confidence interval from 7.9 to 20.5 percent.

The Static-99R probably underestimates recidivism, in that some new sex crimes go unreported or unsolved. On the other hand, it probably overestimates sexually violent predatory recidivism, in that it predicts the rate of any new sex offense, not necessarily a new sexually violent predatory offense.

Follow-up studies in 2014 and 2016 — using larger sample sizes and looking specifically at offenders released in California — had found that low-risk offenders' actual recidivism rates were lower than the Static-99R would have predicted.

A 2015 article stated: "Although we recommend th[at] comprehensive evaluations[] consider both reference groups, the ability of evaluators [t]o improve accuracy by choosing reference groups has yet to be empirically tested[.]"

7

All four experts agreed that studies had found — counter-intuitively — that (1) denial of the offense, (2) minimizing culpability, (3) lack of empathy with the victim, and (4) lack of motivation for treatment were *not* correlated with increased risk.

      2.      *Prosecution experts.*

      a.      *Testimony of Dr. Vorwerk.*

Dr. Vorwerk found defendant's combination of disorders "troublesome," because "[n]ot only does the Pedophilic Disorder render him sexually attracted to children, the Antisocial Personality Disorder enables him to put aside any guilt, any remorse, or any empathy that he should have for the children." Pedophilic Disorder is not curable, though it is "treatable with rigorous, intensive treatment over a long period of time, with the person engaging in that treatment." Similarly, Antisocial Personality Disorder "is chronic, enduring, and it just doesn't go away unless you're in rigorous treatment and desiring to change."

Dr. Vorwerk had scored defendant on the PCL-R, a test of psychopathy, and had found that he had a "high degree of psychopathy." "[A] psychopath is a more severe version of somebody that has Antisocial Personality Disorder." A psychopath "is very callous and has no empathy . . . ." A psychopath is also "very impulsive and sensation[-]seeking . . . ." When defendant talked about abusing C., "it all revolved around how it affected his life detrimentally." He did not express any empathy or remorse.

"[O]ne of the most alarming things" defendant had said was that he wanted to deflower his oldest daughter — to "pop her cherry." When he said this to Dr. Vorwerk, he was "laughing and smirking and had no recognition that this would be extremely damaging to his daughter."

Defendant told Dr. Vorwerk that his 1989 confession to the police was false. "[H]e was coerced by the police and made that up as part of his plea agreement because of what his attorney told him to do." According to defendant, he sexually abused only C., and only one time, which involved "regular sex"; he denied any oral copulation. In that incident, he "hit his daughter in the face and used a belt [on] her . . . ." On a later occasion, "he was only teaching her not to . . . have sex with him again . . . ." This showed denial and a lack of insight.

Defendant also denied sexually abusing R. and H. Initially, he said he never talked to them. Later, however, he said he had babysat them. He said that, at the time the sexual abuse of R. and H. allegedly occurred, he was "drinking heavily."

Defendant had been enrolled in a sex offender program at Coalinga for two years. Initially, his performance was "spotty at best." More recently, he was "doing well," but he was still in "the beginning stage of treatment." The program took a minimum of five to six years to complete, and usually longer.

Defendant felt he did not have a sexual problem and did not need sex offender treatment. He was not taking advantage of other programs he needed, such as programs for distorted thinking, cognitive impairment, coping skills, empathy, and anger

9

management.  He said he had no release plan to avoid being rearrested.[1]  He was "adamant" that he was going to start drinking again when he was released.

While in prison, defendant had been cited for two rule violations, one for possession of pornography and one for fighting.  While at Coalinga, he had put a child pornography video into his video player.

Also while at Coalinga, he had been angry, aggressive, and threatening to staff on at least five occasions.[2]  In one instance, he slapped a staff member's hand.  However, he denied needing an anger management program.  It was concerning that he was still aggressive, despite his advanced age.  His hostility to his wife and daughters was reflected "throughout" his hospital records.  In 2017, he said, "When I get out, I'm going to pop [them]," and made a shooting gesture.

In addition to the Static-99R, Dr. Vorwerk had used the SRA-FV, which looks at "dynamic" — i.e., mutable — risk factors.  Defendant's dynamic factors, including aggression, relational issues, alcohol abuse, and lack of treatment, placed him in the high-risk/high-needs group for purposes of the Static-99R.

In addition to static and dynamic factors, an evaluator should also consider certain "protective factors" — advanced age, a medical condition that impairs sexuality,

---

**1**    Defense counsel later produced a written release plan, prepared by defendant and a social worker.

**2**    Defendant introduced evidence that he had been provoked and that his behavior in response was justifiable, or at least understandable.

completion of a sex offender treatment program, and living in the community for at least five to ten years without reoffending. These reduce the likelihood of reoffending.

Dr. Vorwerk did not consider defendant's age and medical condition to be protective. Although he was 65, the Static-99R already took that into account, giving him minus 3 points for it. He had a number of medical problems, but they had not prevented him from sexually abusing the neighbor girls, and would not prevent him from sexually abusing a child again. The remaining two protective factors also did not apply to defendant.

Finally, in Dr. Vorwerk's opinion, an evaluator should also consider "individual risk factors." Defendant's lack of insight was one individual risk factor. He was "extremely hypersexual" and "sexually preoccupied." He was estranged from his family and thus did not have any family support.

Dr. Vorwerk was "concern[ed]" that defendant had said that his crimes were legally wrong but not morally wrong. This was a "cognitive distortion." Defendant had "emotional impairment," meaning that he did not understand that he was causing someone harm. He also had "volitional impairment," meaning "a serious difficulty controlling [his] behavior." In Dr. Vorwerk's view, conditions of parole, such as outpatient sex offender treatment and GPS monitoring, would not be sufficient to prevent defendant from reoffending.

Dr. Vorwerk concluded that, as a result of defendant's mental disorders, there was a serious and well-founded risk that he would engage in sexually violent predatory

11

criminal behavior. She believed defendant would reoffend in a predatory manner, because his 2002 offenses were predatory.

b.  *Testimony of Dr. Brook.*

Dr. Brook agreed that Pedophilic Disorder is "chronic." "[I]t doesn't go away." Antisocial Personality Disorder is also "chronic."

Dr. Brook used not only the Static-99R, but also an updated version, the Static-2002R. The Static-2002R considers more factors than the Static-99R. Two of these applied to defendant: having at least two victims under 12, at least one of which is unrelated to the perpetrator; and violating community supervision. As a result, defendant's score was 2. That indicates average risk. Some studies had found that using multiple actuarial tools improved predictive accuracy; others had found that it did not.

In assessing risk, Dr. Brook did not consider dynamic factors. Thus, he assessed defendant using the routine norms, not the high-risk/high-needs norms.

However, he did testify that defendant was volitionally impaired, as shown by the fact that he kept doing something he knew was illegal and then, even after a lengthy prison term, he did it again. He was also emotionally impaired, because he was able to maintain sexual arousal with his own children, even when they protested. He had "intimacy deficits," which made him more likely to commit a crime. And he had given conflicting accounts of his molestation of his daughters.

Dr. Brook agreed with Dr. Vorwerk that defendant had no protective factors.

12

In Dr. Brook's opinion, as a result of defendant's mental disorders, there was a serious and well-founded risk that he would reoffend in a sexually violent manner.[3] When asked why, he responded: "[H]e has committed multiple crimes multiple times, committed them again at a much later age, despite knowing what the consequences could be, his lack of empathy for his victims, his lack of acknowledgment for giving different stories for the first set of crimes, his complete and absolute denial of the second set of crimes, his unpredictability in the open community in terms of following normal conventions and societal expectations, as well as some legal expectations." Defendant would be at risk to reoffend unless and until he completed treatment, including ancillary treatment such as anger management.

### 3. *Defense experts*.

#### a. *Testimony of Dr. Jeko*.

In Dr. Jeko's view, there were "questions" about whether the 2002 sexual abuse of the neighbor girls had actually occurred. She noted that they had suffered previous trauma; their grandmother had questioned them (perhaps suggestively) after learning that defendant was a registered sex offender; and there were inconsistencies in their accounts. Also, defendant claimed he pleaded guilty on his attorney's advice, because he was facing a sentence of 25 years to life. If not for the 2002 offense, defendant would have

---

[3] Dr. Brook did not specifically testify that defendant would reoffend in a predatory manner.

13

scored much lower on the Static-99R.  Dr. Jeko agreed, however, that she had to assume the 2002 sexual abuse did actually occur.

Dr. Jeko did not use the SRA-FV because it was based on a dubious sample and it had not been replicated.  She admitted, however, that defendant's dynamic risk factors included a sexual preference for children, lack of emotionally intimate relationships with adults, impulsivity, poor problem-solving, aggrieved thinking, and lack of concern for others.

On the PCL-R, the test of psychopathy, she had scored him at 21 out of 40, which was in the moderate range for a male inmate.  The high range starts at 25.

During defendant's first four months at Coalinga, he had no "behavioral incidents."  In the incidents that occurred later, he did not make physical contact.  Rather, "he yells a lot.  He gets upset."  He had had some valid grievances.

Defendant had "started out really resistant" to sex offender treatment, but recently, he had "kicked up his attendance," "become engaged," and "was doing his homework." Dr. Jeko admitted, however, that defendant had said he did not want to go to treatment.

In Dr. Jeko's opinion, defendant was not likely to reoffend.  If released on parole, he would be subject to restrictive conditions that would both support his rehabilitation and protect the community.

Defendant's parole agent confirmed that, if released on parole, defendant would be subject to extensive supervision and would receive assorted supportive services.

Defendant's social worker testified that defendant had access to supportive services, including sex offender treatment.

b.      *Testimony of Dr. Murphy*.

When Dr. Murphy compared defendant's score on the Static-99R to California norms, his risk of reoffending was negligible — about the same as a non-sex offender. An individual should be compared to local norms, if available. If released on parole, defendant would be closely supervised and required to attend sex offender treatment. Because California uses this "containment model" of parole, one would expect its recidivism rates to be lower than elsewhere.

According to Dr. Murphy, dynamic factors should not be used to predict statistical risk. Using dynamic factors to choose a norm group makes the outcome more subjective and less accurate.

In calculating defendant's static risk, Dr. Murphy accepted that defendant committed the 2002 offenses. If, however, he did not actually commit them, then his scores would have been lower; moreover, there would be no evidence of predatory behavior at all. Dr. Murphy noted the inconsistencies in the two girls' accounts. While defendant was "pretty open" about the offenses against his daughters, he "very firm[ly]" denied the offenses against R. and H. He said he had pleaded guilty because he was facing 25 years to life in prison.

In Dr. Murphy's opinion, defendant was not likely to reoffend. Defendant "ha[d] demonstrated that he was willing to participate in treatment," and he was in fact making progress in treatment.

## II

## THE ADMISSION OF DEFENDANT'S CONFESSION

## AS AN EQUAL PROTECTION VIOLATION

Defendant contends that the trial court erred by admitting his confession when it would have been inadmissible under *Miranda*[4] in an NGI extension proceeding, and when there was no proof that its admission did not violate equal protection.

A.  *Additional Factual and Procedural Background*.

In 1989, while defendant was under arrest for an unrelated assault, a police officer gave him *Miranda* warnings. When asked if he was willing to talk, he said, "I guess I want an attorney," thus terminating the questioning.

Two days later, one of defendant's daughters disclosed the sexual abuse. Thus, while he was still in custody, a different police officer gave him *Miranda* warnings again. He purported to waive his *Miranda* rights. He then confessed to sexually abusing his daughters.

In this proceeding, defendant filed a motion in limine to exclude his 1989 confession, based on *Miranda*. He did not contend that *Miranda* applies, of its own force, in an SVP proceeding. (See *Allen v. Illinois* (1986) 478 U.S. 364, 368-374 [Fifth

_____

**4**  *Miranda v. Arizona* (1966) 384 U.S. 436.

16

Amendment right against compulsory self-incrimination does not apply in proceeding for civil commitment of a sexually dangerous person]; *People v. Allen* (2008) 44 Cal.4th 843, 860 [Fifth Amendment right against compulsory self-incrimination does not apply in SVP proceeding].)  Rather, he cited Penal Code section 1026.5, subdivision (b)(7), which provides that, in an NGI extension proceeding, the defendant "shall be entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings.  All proceedings shall be in accordance with applicable constitutional guarantees."  (Pen. Code, § 1026.5, subd. (b)(7).)  He then argued that, as a matter of equal protection, the defendant in an SVP proceeding must be accorded the same rights.

The trial court denied the motion.  It explained that, in its view, defendant was improperly trying to relitigate his 1989 conviction.

B.    *Discussion.*

1.    *The Edwards rule.*

Once defendant invoked his right to counsel, the police were prohibited from reinitiating an interrogation as long as he remained in custody.  (*Edwards v. Arizona* (1981) 451 U.S. 477, 484-485.)  That is true even though he was given new *Miranda* warnings and purported to waive his rights.  (*Id.* at p. 487.)  It is true even though he was questioned by a different officer who did not know that he had invoked his right to counsel.  (*Arizona v. Roberson* (1988) 486 U.S. 675, 688-689.)  And it is true even though he was questioned about a separate investigation.  (*Id.* at p. 683.)  Thus

17

defendant's confession was taken in violation of *Miranda*.  The People do not argue

otherwise.

> 2.   *Application to an NGI Extension Proceeding*.

As noted, defendant contends that equal protection entitles him to the same rights

as in an NGI extension proceeding, including the *Edwards* rule.  Hence, there is a

threshold issue as to whether the *Edwards* rule applies in an NGI extension proceeding.

> a.   *Whether the <u>Edwards</u> rule is a federal constitutional right*.

As mentioned, Penal Code section 1026.5, subdivision (b)(7) provides that an NGI

is entitled to  "the rights guaranteed under the federal and State Constitutions for criminal

proceedings . . . ."  The United States Supreme Court has "frequently emphasized that the

*Edwards* rule is not a constitutional mandate, but judicially prescribed prophylaxis.

[Citations.]"  (*Maryland v. Shatzer* (2010) 559 U.S. 98, 105; see also *Solem v. Stumes*

(1984) 465 U.S. 638, 644, fn. 4 & 646.)

That court, however, has likewise "repeatedly referred to the *Miranda* warnings as

'prophylactic,' [citation] and 'not themselves rights protected by the Constitution,'

[citation] . . . ."  (*Dickerson v. United States* (2000) 530 U.S. 428, 437-438.)

Nevertheless, in *Dickerson*, it held squarely that *Miranda* was "a constitutional decision

. . . ."  (*Id*. at p. 432.)  It explained that the "first and foremost . . . factor[]" indicating the

constitutional status of the *Miranda* rule was "that both *Miranda* and two of its

companion cases applied the rule to proceedings in state courts — to wit, Arizona,

California, and New York.  [Citation.]  Since that time, we have consistently applied

18

*Miranda*'s rule to prosecutions arising in state courts.  [Citations.]  It is beyond dispute that we do not hold a supervisory power over the courts of the several States.  [Citations.]  With respect to proceedings in state courts, our 'authority is limited to enforcing the commands of the United States Constitution.'  [Citations.]"  (*Id*. at pp. 438-439, fn. omitted.)  Just like *Miranda*, *Edwards* was entitled "*v. Arizona*."  It arose from a prosecution in a state court.  Therefore, it implicitly but necessarily held that the rule that it stated was a constitutional rule.

> b.      *Whether the* <u>Edwards</u> *rule is "applicable" within the*
>
> *meaning of Penal Code section 1026.5, subdivision* (*b*) (*7*).

Even though the *Edwards* rule is a constitutional right, it is not incorporated into Penal Code section 1026.5, subdivision (b)(7) per se.  Once again, that subdivision provides that, in an NGI commitment extension proceeding, "All proceedings shall be in accordance with applicable constitutional guarantees."  The key word here is "applicable."

In *Hudec v. Superior Court* (2015) 60 Cal.4th 815, our Supreme Court shed light on how to determine whether a given constitutional right is "applicable."  *Hudec* held that Penal Code section 1026.5, subdivision (b)(7) gives an NGI committee the right to refuse to testify at trial.  (*Hudec v. Superior Court*, *supra*, at pp. 818, 826-832.)

It began by noting that "section 1026.5(b)(7) poses a degree of inherent difficulty.  By its terms, the statute in effect commands a translation or transposition of procedural

19

rights from the criminal context to the noncriminal, contexts sufficiently different to raise a question of its interpretation." (*Hudec v. Superior Court*, *supra*, 60 Cal.4th at p. 826.)

The court rejected an interpretation that *no* constitutional rights available in criminal proceedings were "applicable," simply because a civil commitment proceeding is not criminal; that "would render the statutory provision a nullity." (*Hudec v. Superior Court*, *supra*, 60 Cal.4th at pp. 826-827.)

However, it also rejected an interpretation that *all* constitutional rights available in criminal proceedings were "applicable." It explained: "Where a right applicable in criminal proceedings cannot logically be provided within the framework of an NGI commitment extension hearing, we might infer the Legislature could not have meant for section 1026.5(b)(7) to encompass it." (*Hudec v. Superior Court*, *supra*, 60 Cal.4th at p. 828.) It gave the example that, if an NGI committee had the right not to be tried while mentally incompetent, "the issue of an NGI respondent's continuing mental illness, central to the hearing under section 1026.5, subdivision (b)(1), would tend to be subsumed within nonstatutory proceedings on mental competence, and the hearing called for by section 1026.5 could be indefinitely delayed. [Citations.]" (*Id*. at pp. 828-829.)

Finally, the court noted "the idea, first posited in [*People v. Superior Court* (*Williams*) (1991) 233 Cal.App.3d 477], that constitutional rights bearing no 'relevant relationship' to commitment extension proceedings are not included in the granting language of section 1026.5(b)(7) . . . ." (*Hudec v. Superior Court*, *supra*, 60 Cal.4th at p. 829.) For this reason, *Williams* had held that double jeopardy did not apply in an NGI

20

extension proceeding. (*People v. Superior Court* (*Williams*), *supra*, 233 Cal.App.3d at p. 488.) *Hudec* found it unnecessary to decide, however, whether *Williams* was correct on this point, because it concluded that the right not to testify at trial *did* have a relevant relationship to an NGI extension proceeding. (*Hudec v. Superior Court*, *supra*, at p. 830.)

The court explained: "The right not to testify in a proceeding where one is a defendant is a right that *could* meaningfully apply in any type of adversarial proceeding, though only in criminal cases is it constitutionally guaranteed. In contrast to double jeopardy . . . , the right not to testify does not take its very meaning from the criminal context, nor does applying it when the prosecution seeks to compel the respondent's testimony in an NGI commitment extension hearing present any logical difficulty. . . . 'The right to not be compelled to testify against oneself is clearly and relevantly implicated when a person is called by the state to testify in a proceeding to recommit him or her even if what is said on the witness stand is not per se incriminating.' [Citation.]" (*Hudec v. Superior Court*, *supra*, 60 Cal.4th at p. 830.)

We cannot say that *Miranda* rights "cannot logically be provided within the framework of an NGI commitment extension hearing" (or an SVP proceeding). They simply mean that the committee's unwarned statements to the police in response to custodial interrogation generally must be excluded.[5] Similarly, we cannot say that

---

[5] Significantly, we are dealing exclusively with statements to the police. Thus, we need not decide whether statements by a committee to a psychological examiner may require *Miranda* warnings, nor whether excluding such statements when

21

*Miranda* rights have no "relevant relationship" to an NGI extension proceeding.  In the words of *Hudec*, *Miranda* rights "*could* meaningfully apply in any type of adversarial proceeding . . . ."  (*Hudec v. Superior Court*, *supra*, at p. 830.)

We therefore conclude that the *Edwards* rule does apply in NGI extension proceedings under Penal Code section 1026.5, subdivision (b)(7).

### 3.    *Equal protection principles*.

In *People v. McKee*, *supra*, 47 Cal.4th 1172 (*McKee I*), our Supreme Court held that SVPs are similarly situated to NGIs (*id*. at p. 1207) and mentally disordered offenders (MDOs) (*id*. at p. 1203); accordingly, it was a violation of equal protection to commit SVPs indefinitely when NGIs and MDOs could be committed only for the maximum term of their underlying offense, unless the People could "demonstrate [a] constitutional justification" for the distinction.  (*Id*. at pp. 1207-1208.)  The Supreme Court "remand[ed] to the trial court to permit the People the opportunity to justify the differential treatment in accord with established equal protection principles.  [Citation.]" (*Id.* at p. 1184.)

On remand, after a trial, the Court of Appeal held in *People v. McKee* (2012) 207 Cal.App.4th 1325 (*McKee II*), that the disparate treatment did not violate equal protection.  It reviewed the extensive evidence developed in the trial court (*id*. at pp. 1339-1347) and found "substantial evidence to support a reasonable perception by the

---

*Miranda* warnings were not given is logically consistent with an NGI extension proceeding or an SVP proceeding.

electorate that SVP's present a substantially greater danger to society than do MDO's or NGI's, and therefore the disparate treatment of SVP's . . . is necessary to further the People's compelling interests of public safety and humane treatment of the mentally disordered." (*Id*. at pp. 1330-1331; see also *People v. Field* (2016) 1 Cal.App.5th 174, 190-192 [following *McKee II*]; *People v. Gray* (2014) 229 Cal.App.4th 285, 291 [same]; *People v. Kisling* (2014) 223 Cal.App.4th 544, 547-548 [same]; *People v. McDonald* (2013) 214 Cal.App.4th 1367, 1371, 1377-1382 [same]; ; *People v. Landau* (2013) 214 Cal.App.4th 1, 45-48 [same]; *People v. McCloud* (2013) 213 Cal.App.4th 1076, 1085-1086 [same]; *People v. McKnight* (2012) 212 Cal.App.4th 860, 862-864 [same].)

In the wake of *McKee I*, *People v. Curlee* (2015) 237 Cal.App.4th 709 likewise held that SVPs are similarly situated to NGIs with respect to NGIs' statutory right not to be forced to testify (Pen. Code, § 1026.5, subd. (b)(7)). (*Curlee*, *supra*, at pp. 720-721.) It remanded for "an evidentiary hearing at which the People will have the opportunity to show that the differential statutory treatment of SVP's and NGI's is justified." (*Id*. at p. 722; accord, *People v. Landau* (2016) 246 Cal.App.4th 850, 864-865.)

We are unable to distinguish *McKee I*, *Curlee*, and *Landau*. A petition for the initial commitment of an SVP (Welf. & Inst. Code, §§ 6601, subds. (h), (i), 6601.3, subd. (a)) is precisely analogous to a petition to extend the commitment of an NGI (Pen. Code, § 1026.5). Both SVPs and NGIs have been found guilty of a crime; both have served the applicable sentence (with the trivial difference that the SVP served it while incarcerated,

whereas the NGI served it while civilly committed); and the state is trying to civilly commit both for an extended period.

When the People seek to extend an NGI's commitment, by statute, the defendant is "entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings . . . ." (Pen. Code, § 1026.5, subd. (b)(7).) Although we have not found any case specifically involving the application of *Miranda* in the NGI extension context, it seems inescapable that a statement obtained in violation of *Miranda* cannot be introduced against the defendant in an NGI extension proceeding.

When the People seek to commit a defendant as an SVP, the defendant enjoys no similar statutory protection. Under *McKee I*, *Curlee*, and *Landau*, however, it follows that defendant was entitled to the protections of *Miranda*, unless and until the People could demonstrate a constitutional justification for the distinction.[6] Again, the People do not argue otherwise.

As the People note, *McKee II* established that there is a constitutional justification for distinguishing SVPs from NGIs and MDOs *with respect to an indefinite commitment* — namely, that SVPs present a substantially greater danger to society. In particular, SVPs are significantly more likely to commit new sexual offenses (*McKee II*, *supra*, 207

---

[6]    *People v. Landau*, *supra*, 214 Cal.App.4th 1 held that the Fourth Amendment exclusionary rule does not apply of its own force in an SVP proceeding. (*Id.* at pp. 18-23.) It did not decide any issue regarding *Miranda*'s Fifth Amendment exclusionary rule. It also did not consider whether SVPs have a statutory right to exclusion as a matter of equal protection. (*Landau, supra,* at pp. 45-48.) Accordingly, it is not helpful here.

Cal.App.4th at pp. 1340-1342); victims of sexual offenses suffer unique and, generally, greater trauma (*id*. at pp. 1342-1344); and SVPs have different diagnoses that require longer continuous treatment (*id*. at pp. 1344-1347) — all factors that favor an indefinite commitment.  But the People do not argue that these factors conclusively establish a constitutional justification for distinguishing SVPs from NGIs *with respect to* <u>Miranda</u>. (See *People v. Curlee*, *supra*, 237 Cal.App.4th at p. 721 [*McKee II* does not establish a constitutional justification for the disparate treatment of SVPs with respect to the right not to testify].)  We therefore express no view on this proposition.  We leave it open to be litigated below, if raised.

### 3. *Forfeiture*.

The People argue that defendant forfeited his *Miranda* claim in 1989 by pleading guilty to the sexual abuse.  However, they do not point to any legal theory supporting forfeiture.

The People note that a guilty plea severely limits the claims that a defendant can raise in an appeal from the resulting conviction.  "'[A] guilty plea constitutes an admission of every element of the offense charged and constitutes a conclusive admission of guilt.  [Citation.]  . . .  Accordingly, a plea of guilty waives any right to raise questions regarding the evidence, including its sufficiency or admissibility, and this is true whether or not the subsequent claim of evidentiary error is founded on constitutional violations. [Citation.]  . . . ." [Citation.]' [Citation.]" (*People v. Cisneros-Ramirez* (2018) 29 Cal.App.5th 393, 405.)  In particular, a defendant who has pleaded guilty "is precluded

25

from obtaining appellate review of his motion to exclude statements on the grounds he was interrogated without a valid *Miranda* warning and waiver. [Citations.]" (*Id*. at p. 406.)

We know of no rule, however, that a guilty plea precludes the defendant from asserting a *Miranda* claim in any proceeding *other than* an appeal or a similar attack on the conviction. A defendant could reasonably plead guilty, despite having a meritorious *Miranda* claim, if there is sufficient other evidence of guilt. Hence, a guilty plea is a conclusive admission that there is sufficient evidence of guilt, and it is a forfeiture of a *Miranda* claim in that criminal proceeding, but it is not a conclusive admission that a *Miranda* claim would have no merit. The People assert that defendant "is attempting to collaterally attack [the] guilty plea . . . ." But not at all. His guilty plea and his conviction will remain valid, regardless of whether his confession must be excluded in this SVP proceeding.

As defendant argues: "Suppose that in 1989 a second criminal case had been brought against [defendant] and that [defendant]'s statement taken in violation of *Miranda* had been relevant to that second criminal case. The fact that [defendant] had pled guilty in the first case would not mean that [defendant]'s statement taken in violation of *Miranda* would be admissible in that second case."

Finally, as defendant also aptly argues, because he pled guilty, his *Miranda* claim has never been litigated. Thus, there is no basis for collateral estoppel. (See generally *People v. Carter* (2005) 36 Cal.4th 1215, 1240.)

26

4.      *Prejudicial or harmless error.*

The People also contend that the asserted *Miranda* violation was harmless.

Determining what harmless error standard applies in this case is a nice question. In *McKee*, the error was prejudicial under any standard, so the court did not address this issue.

As the People note, a *Miranda* error is a federal constitutional violation; it therefore requires reversal unless we can say that it was harmless beyond a reasonable doubt.  (See generally *Chapman v. California* (1967) 386 U.S. 18, 24.)  If defendant had *Miranda* rights at all, however, they did not derive from *Miranda* itself.  Rather, they derived from the interaction between the federal right to equal protection and an NGI's state statutory rights.

Ordinarily, a violation of equal protection is also a federal constitutional violation; hence, it, too, is subject to the "beyond a reasonable doubt" harmless error standard. (*People v. Taylor* (1982) 31 Cal.3d 488, 501-502.)  Here, however, if an NGI's *Miranda* rights under state statute were violated, the violation would be one of state law.  (See *People v. Epps* (2001) 25 Cal.4th 19, 29 [violation of state statutory right to jury trial was subject to state harmless error standard].)  Therefore, the applicable harmless error standard would be whether there is a reasonable probability that the result would have been more favorable to the defendant in the absence of the error.  (See generally *People v. Watson* (1956) 46 Cal.2d 818, 836.)

27

Unless the People can show otherwise on remand, defendant is entitled to be treated like an NGI. This means that he has *Miranda* rights; however, it also means that, if those *Miranda* rights are violated, the "reasonable probability" harmless error standard should apply. (See *Conservatorship of E.B.* (2020) 45 Cal.App.5th 986, 998, review granted June 24, 2020, S261812.)

Even under this lower standard, however, there is a reasonable probability of a more favorable outcome if defendant's confession had not been admitted.

"'A confession is like no other evidence. Indeed, "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him . . . . [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so." [Citations.] . . . .' [Citation.]" (*People v. Bridgeford* (2015) 241 Cal.App.4th 887, 904-905.)

Here, in his confession, defendant admitted sexually abusing his own daughters in shockingly matter-of-fact terms. Even if all the factual information in it had been available from other sources, the confession would have tended to make the jury think that defendant was a very bad man who should be locked up.

And defendant's confession was not merely cumulative. It is true that without it, the prosecution still would have been able to prove that he had pleaded guilty to two counts of a forcible lewd act on C. In addition, as Dr. Vorwerk testified, the police had

28

interviewed C., and C. had recounted certain details of defendant's sexual abuse of her and her sisters. But even if defendant's confession merely corroborated C.'s account, it did so in a uniquely compelling way. And as Dr. Vorwerk put it, defendant's confession not only corroborated C.'s statements, it "provided much more." It included statements about his state of mind — statements on which Dr. Vorwerk relied in forming her opinions.

For example, defendant told police that he knew what he was doing was illegal, but he felt it was not morally wrong. Dr. Vorwerk found that this was a cognitive distortion as well a sign of emotional impairment. He said he "got the idea it was okay" when he was in Georgia, because sex with children "was a way of life in Georgia." Dr. Vorwerk identified this as another cognitive distortion.

He said he had sex with his daughters daily and with his wife daily. In Dr. Vorwerk's opinion, this showed hypersexuality.

Defendant admitted having thought about "popping [his] daughter's cherry." Dr. Vorwerk found this "one of the most alarming things." It was a sign of Pedophilic Disorder, as was his admission in his confession that he asked to see his wife's eight-year-old sister's genitals.

Last but not least, defendant told police, "I could not stop it myself, so I asked them to stop me from doing it." Dr. Vorwerk saw this as volitional impairment. Another sign of volitional impairment was the fact that, in his confession, defendant was "very apologetic and sorry," yet in 2002, he reoffended. This evidence was particularly

29

prejudicial, because it showed that defendant had serious difficulty controlling his violent sexual impulses, as the Act requires. (Welf. & Inst. Code, § 6600, subd. (c); *People v. Krebs* (2019) 8 Cal.5th 265, 326.)

Admittedly, when Dr. Vorwerk interviewed defendant, he repeated some of these statements. However, he also denied others; he claimed that he sexually abused only C., and her only once; he denied orally copulating any of his daughters. Dr. Vorwerk found these very contradictions "concerning," because they showed denial or lack of insight, which in turn showed that he would not be motivated to seek out and to cooperate with treatment.

Finally, the case against defendant was not overwhelming. Defense counsel and the two defense experts raised substantial questions about whether defendant actually committed the 2002 offenses. They made a strong showing that it was inappropriate for the prosecution experts to rely on dynamic factors to increase defendant's risk above that shown by the Static-99R. And finally, they showed that defendant would be subject to stringent parole conditions, and they put it to the jury that these would prevent him from reoffending.

We therefore conclude that, unless the People can demonstrate a constitutional justification for the distinction between the statutory *Miranda* rights of SVPs and NGIs, the admission of defendant's confession prejudicially violated these rights.

30

In light of this conclusion, we need not address defendant's alternative contention that, assuming equal protection requires him to be treated like an NGI, his confession was also inadmissible as involuntary.

Under *McKee I*, the appropriate appellate remedy is to "remand to the trial court to permit the People the opportunity to justify the differential treatment in accord with established equal protection principles. [Citation.]" (*McKee I*, *supra*, 47 Cal.4th at p. 1184; see also *id*. at pp. 1208-1209.) In our disposition, we will do so.

III

THE CONSTITUTIONALITY OF THE ACT

Defendant contends that, for various reasons, the Act is unconstitutional.

A.    *Relevant Provisions of the Act*.

The Act provides for the civil commitment of sexually violent predators for the purpose of treatment. (Welf. & Inst. Code, §§ 6604, 6606, subd. (a).)

In an initial commitment proceeding, the trier of fact must "determine . . . , beyond a reasonable doubt, [that] the person is a sexually violent predator." (Welf. & Inst. Code, § 6604.) "Sexually violent predator" is defined as "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (Welf. & Inst. Code, § 6600, subd. (a)(1).)

Under the Act as first enacted, a commitment was for a two-year period; at the end of that time, if the People did not want the committee released, they had to file a new petition. (Welf. & Inst. Code, former § 6604, Stats. 1995, ch. 763, § 3, pp. 5925-5926.) This proved impracticable, and in 2006, Proposition 83 amended the Act so as to provide that the commitment is for an indeterminate term. (Welf. & Inst. Code, § 6604.)

B.    *The Burden of Proof on a Conditional Release Petition*

       *As a Violation of Due Process*.

Unless the State Department of State Hospitals recommends that an SVPA committee be released (see Welf. & Inst. Code, §§ 6604.9, subd. (d), 6605), he or she cannot obtain unconditional release; he or she can obtain conditional release (Welf. & Inst. Code, § 6608) only by proving, by a preponderance of the evidence, "that conditional release to a less restrictive alternative is in [his or her] best interest . . . and that conditions can be imposed that would adequately protect the community . . . ." (*Id*., subd. (k).)

Defendant contends that the Act violates due process because a committee who brings a petition for conditional release has the burden of proof, by a preponderance of the evidence. (Welf. & Inst. Code, § 6608, subd. (k).) As defendant argues, "once a person is committed, he can be held for years, for decades, for the rest of his life[,] without any requirement that the State prove that he remains mentally ill and dangerous."

We question whether this issue is ripe. This is an initial commitment proceeding, not a conditional release proceeding. Defendant may never file a conditional release

32

petition; if he does, he will be free to argue then that the statutory burden of proof is unconstitutional.

In any event, as defendant acknowledges, the California Supreme Court rejected this very argument in *McKee I*. He claims that "the California Supreme Court erred on this issue." As he also concedes, however, we are required to follow *McKee I*, even if we believe it is erroneous (which we do not). (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

C.     *Double Jeopardy*.

Defendant contends that, as a result of Proposition 83's amendments in 2006, making an SVP commitment indeterminate, the Act has become punitive and therefore criminal, and therefore it violates double jeopardy.

As defendant forthrightly concedes, this contention has already been rejected by this court (*People v. Taylor* (2009) 174 Cal.App.4th 920, 936-937) as well as by other courts (*People v. Field*, *supra*, 1 Cal.App.5th at pp. 189-190 & fn. 5; *People v. McDonald*, *supra*, 214 Cal.App.4th at p. 1383; *People v. Landau*, *supra*, 214 Cal.App.4th at pp. 44-45.) In addition, in *McKee I*, the Supreme Court held that "the Proposition 83 amendments do not make the Act punitive" for ex post facto purposes. (*McKee I, supra,* 47 Cal.4th at p. 1195.) We see no way it can be punitive for double jeopardy purposes, but not for ex post facto purposes. We reject this contention summarily for the reasons stated in those cases.

33

D.    *Vagueness of the Word "Likely."*

Defendant contends that "likely," as used in the phrase "it is likely that he or she will engage in sexually violent criminal behavior" (Welf. & Inst. Code, § 6600, subd. (a)(1)), is unconstitutionally vague.

Preliminarily, the People respond that defendant forfeited this contention by failing to raise it below. However, a claim that a statute is unconstitutionally vague on its face (rather than as applied) presents a pure question of law that may be raised for the first time on appeal. (See *In re Sheena K.* (2007) 40 Cal.4th 875, 880-889.)

A statute is so vague as to violate due process if it "'forbids or requires the doing of an act in terms so vague' that people of 'common intelligence must necessarily guess at its meaning and differ as to its application.' [Citations.]" (*People v. Hall* (2017) 2 Cal.5th 494, 500.)

"Only a reasonable degree of certainty is required, however. [Citation.] The analysis begins with 'the strong presumption that legislative enactments "must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears. [Citations.] A statute should be sufficiently certain so that a person may know what is prohibited thereby and what may be done without violating its provisions, but it cannot be held void for uncertainty if any reasonable and practical construction can be given to its language."' [Citation.]" (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1107.)

Our Supreme Court has defined "likely" in this context as follows: "[A] person is 'likely [to] engage in sexually violent criminal behavior' if . . . the person . . . present[s] a

34

*substantial danger*, that is, a *serious and well-founded risk*, of committing such crimes if released from custody." (*People v. Roberge* (2003) 29 Cal.4th 979, 988.)

Defendant argues that "[w]hat a risk must be to be 'serious,' to be 'substantial,' to be 'well-founded,' are questions of law upon which the minds of individual jurors might vary widely." He suggests that the statute is vague because it lacks a "quantitative standard[] of risk."

"'The law is replete with instances in which a person must, at his peril, govern his conduct by such nonmathematical standards as "reasonable," "prudent," "necessary and proper," "substantial," and the like. Indeed, a wide spectrum of human activities is regulated by such terms: thus one man may be given a speeding ticket if he overestimates the "reasonable or prudent" speed to drive his car in the circumstances [citation], while another may be incarcerated in state prison on a conviction of willful homicide if he misjudges the "reasonable" amount of force he may use in repelling an assault [citation]. . . . "There is no formula for the determination of reasonableness." Yet standards of this kind are not impermissi[b]ly vague, provided their meaning can be objectively ascertained by reference to common experiences of mankind.' [Citation.]" (*People v. Morgan* (2007) 42 Cal.4th 593, 606.)

Statutes using similar terms, such as "probability" and "danger," have been upheld as not unconstitutionally vague.

In *Jurek v. Texas* (1976) 428 U.S. 262, a majority of the United States Supreme Court held that "'whether there is a probability that the defendant would commit criminal

acts of violence that would constitute a continuing threat to society'" (*id*. at p. 272) — a finding that Texas required for the death penalty — was not unconstitutionally vague. (*Id*. at pp. 274-276 [lead opn. of Stewart, J, joined by Powell, and Stevens, JJ.], 278-279 [conc. opn. of White, J., joined by Burger, and Rehnquist, JJ.]) The lead opinion stated: "It is, of course, not easy to predict future behavior. The fact that such a determination is difficult, however, does not mean that it cannot be made. Indeed, prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system. The decision whether to admit a defendant to bail, for instance, must often turn on a judge's prediction of the defendant's future conduct. And any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose. For those sentenced to prison, these same predictions must be made by parole authorities. The task that a Texas jury must perform in answering the statutory question in issue is thus basically no different from the task performed countless times each day throughout the American system of criminal justice." (*Ibid*., fns. omitted.)[7]

*People v. Flores* (2014) 227 Cal.App.4th 1070 held that whether a person poses "an unreasonable risk of danger to public safety" is not unconstitutionally vague. (*Id*. at pp. 1074-1075.) "The word 'unreasonable' '"is a widely used and well understood word

---

[7] The concurring opinion stated: "I agree with [the lead opinion] that the issues posed in the sentencing proceeding have a common-sense core of meaning and that criminal juries should be capable of understanding them." (*Jurek v. Texas*, *supra*, 428 U.S. at pp. 278-279 [conc. opn. of White, J.].)

and clearly so when juxtaposed"' with 'risk of danger.' [Citations.]" (*Id.* at p. 1075; accord, *People v. Garcia* (2014) 230 Cal.App.4th 763, 768-770.)

And of particular relevance here, *People v. Kirk* (1975) 49 Cal.App.3d 765 held that "dangerous," as used in the definition of a mentally disordered sex offender, is not unconstitutionally vague. (*Id.* at pp. 768-772.) "Webster's Third New International Dictionary defines 'dangerous' as 'able or likely to inflict injury: causing or threatening harm.' Such a meaning is one commonly understood by people of reasonable intelligence." (*Id.* at p. 769; see also *Rupf v. Yan* (2000) 85 Cal.App.4th 411, 423-427 [whether person would present a danger to him or herself or others if firearm is returned is not unconstitutionally vague]; *People v. Alvas* (1990) 221 Cal.App.3d 1459, 1466-1467 ["dangerousness," when defined as "the potential for infliction of substantial harm upon the defendant himself or upon others," is not unconstitutionally vague], disapproved on other grounds by *People v. Barrett* (2012) 54 Cal.4th 1081, 1106.)

Here, "danger," in the definition of "likely," does not stand alone; there must be a "*substantial* danger." Likewise, "risk" does not stand alone; there must be "a *serious and well-founded* risk." These are all commonly understood terms, with dictionary definitions. They are not vague just because they cannot be readily translated into quantitative standards.

Defendant relies on *Johnson v. United States* (2015) 576 U.S. 591. There, the Supreme Court held that the so-called "residual clause" of the Armed Career Criminal Act was unconstitutionally vague. That clause prohibited the possession of firearms by a

person convicted of a felony that "'involves conduct that presents a serious potential risk of physical injury to another.'" (*Id*. at p. 594, italics omitted.)

It was central to the court's analysis that it had previously held that, in applying the residual clause, a court must assess the risk presented by the felony "'in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion.' [Citation.]" (*Johnson v. United States*, *supra*, 576 U.S. at p. 596.) To put it another way, the residual clause "requires a court to picture the kind of conduct that the crime involves in 'the ordinary case,' and to judge whether that abstraction presents a serious potential risk of physical injury. [Citation.]" (*Ibid*.)

The court concluded that the residual clause was vague in two mutually reinforcing respects. First, it was not clear how to determine how much risk a given felony presented. "[W]hat kind of conduct the 'ordinary case' of a crime involves" was vague; also, "assessing 'potential risk' seemingly requires the judge to imagine how the idealized ordinary case of the crime subsequently plays out." (*Johnson v. United States*, *supra*, 576 U.S. at p. 597.) Second, it was not clear "how much risk it takes" for a felony to qualify. (*Id*. at p. 598.) "By combining indeterminacy about how to measure the risk posed by a crime with indeterminacy about how much risk it takes for the crime to qualify as a violent felony, the residual clause produces more unpredictability and arbitrariness than the Due Process Clause tolerates." (*Id*. at p. 598.)

The court cautioned, however: "As a general matter, we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as

38

'substantial risk' to real-world conduct; 'the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree,' [citation]." (*Johnson v. United States*, *supra*, 576 U.S. at pp. 603-604.)  Similarly, while it held that "serious potential risk" was vague, it limited that holding to the context in which it arose:  "It is one thing to apply an imprecise 'serious potential risk' standard to real-world facts; it is quite another to apply it to a judge-imagined abstraction."  (*Id*. at p. 598.)

*Johnson* is obviously distinguishable, because here, the test of whether the defendant is likely to engage in sexually violent criminal behavior is applied to a real-world person and his real-world conduct, not to a hypothetical abstraction.

*People v. White* (2016) 3 Cal.App.5th 433 held that "sexually violent criminal behavior" is not unconstitutionally vague.  (*Id*. at pp. 453-456.)  In the process, it also concluded that "likely" is not unconstitutionally vague, distinguishing *Johnson*:  "That portion of the SVPA requiring evidence that a defendant is likely to engage in sexually violent criminal behavior suffers from neither of the defects identified in *Johnson*.  There is no uncertainty regarding the risk involved in sexually violent criminal behavior.  Under the SVPA, 'a person is "likely [to] engage in sexually violent criminal behavior" if at trial the person is found to present a *substantial danger*, that is, a *serious and well-founded risk*, of committing such crimes if released from custody.  [Fn. omitted.]' [Citation.]  The required factual determination lacks the uncertainty deemed fatal to the statute in *Johnson*."  (*Id*. at p. 455.)

39

We therefore conclude that "likely," as used in Welfare and Institutions Code section 6600, subdivision (a), and as defined by the California Supreme Court, is not unconstitutionally vague.

E.      *Vagueness of the Words "Casual Acquaintance."*

Defendant contends that "casual acquaintance," as used in the Act, is unconstitutionally vague.

Once again (see part III.D, *ante*), the People respond that defendant forfeited this contention by failing to raise it below.  But, once again, a facial vagueness claim may be raised for the first time on appeal.  (See *In re Sheena K.*, *supra*, 40 Cal.4th at pp. 880-889.)

The Act "contains an implied requirement that a trier of fact must find beyond a reasonable doubt that the defendant is likely to commit sexually violent *predatory* criminal acts before the defendant can be committed as a sexually violent predator." (*People v. Hurtado* (2002) 28 Cal.4th 1179, 1186.)

"Predatory" is defined as "directed toward a stranger, *a person of casual acquaintance with whom no substantial relationship exists*, or an individual with whom a relationship has been established or promoted for the primary purpose of victimization." (Welf. & Inst. Code, § 6600, subd. (e), italics added.)

"[I]n evaluating challenges based on claims of vagueness, . . . '[t]he particular context is all important.'  [Citation.]"  (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1116.)  Here, the whole phrase is "a person of casual acquaintance with whom no

substantial relationship exists." This is contrasted with "a stranger" on the one hand, and "an individual with whom a relationship has been established" on the other hand. Thus, a "casual acquaintance" is someone the defendant knows, but with whom the defendant has no substantial, established relationship.

Defendant's contention, then, reduces to a claim that "substantial" is vague. This claim has repeatedly been rejected. "The word 'substantial' is not vague, overbroad, or ambiguous. [Citations.] It requires no further definition, is readily understandable, and has no technical meaning peculiar to the law." (*People v. Boyce* (2014) 59 Cal.4th 672, 711; see, e.g., *People v. Morgan*, *supra*, 42 Cal.4th at pp. 606-607 ["substantial distance"]; *People v. Silver* (1991) 230 Cal.App.3d 389, 393-395 ["substantially similar"].)

Dr. Vorwerk opined that defendant was likely to reoffend in a predatory manner, because in his 2002 offenses, "[h]e did not have a close relationship with those girls . . . . They were casual acquaintances that he had as neighbors. So that would technically be considered predatory." Dr. Murphy agreed, at least implicitly, by testifying that, in the absence of the 2002 offenses, there would be no evidence that defendant had engaged in predatory behavior.

Defendant complains that it was not clear, on this record, whether he and the neighbor girls were casual acquaintances. The evidence showed that he talked to them often from his upstairs window when they were playing downstairs and he claimed to have babysat them (he did not say how often). In our view, this made them casual

41

acquaintances as a matter of law. But even assuming that reasonable minds could disagree — in this particular case, or in some other hypothetical case — that is not enough to make the term unconstitutionally vague. (See *Buhl v. Hannigan* (1993) 16 Cal.App.4th 1612, 1622-1623.)

IV

THE SUFFICIENCY OF THE EVIDENCE

Defendant contends that, for various reasons, there was insufficient evidence that he was an SVP.

"'When an appellant asserts there is insufficient evidence to support the judgment, our review is circumscribed. [Citation.] We review the whole record most favorably to the judgment to determine whether there is substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could have made the requisite finding under the governing standard of proof.' [Citation.]" (*People v. Flores* (2006) 144 Cal.App.4th 625, 632.) "'In reviewing the record to determine the sufficiency of the evidence this court may not redetermine the credibility of witnesses, nor reweigh any of the evidence, and must draw all reasonable inferences, and resolve all conflicts, in favor of the judgment.' [Citation.]" (*People v. Sumahit* (2005) 128 Cal.App.4th 347, 352.)

A. *The Sufficiency of the Evidence That Defendant Was "Likely" to Reoffend.*

Defendant contends that there was insufficient evidence that he was "likely to engage in sexually violent criminal behavior." (Welf. & Inst. Code, § 6600, subd. (a)(1).)

42

He argues that there was no evidence that he had any numerical probability of reoffending higher than 13 percent, and that 13 percent is insufficient.

As discussed in part III.D, *ante*, "likely" is a qualitative, not a quantitative, term. "The word 'likely,' as used in the statute, . . . must be construed in light of the 'difficulties inherent in predicting human behavior' [citation], particularly in mathematical terms." (*People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888, 921.) "[T]he phrase '*likely* to engage in acts of sexual violence' . . . connotes much more than the mere *possibility* that the person will reoffend as a result of a predisposing mental disorder that seriously impairs volitional control." (*Id*. at p. 922.) But it "does not mean the risk of reoffense must be higher than 50 percent." (*Id*. at p. 916; see also *People v. Roberge*, *supra*, 29 Cal.4th at p. 982.)

In *People v. McCloud*, *supra*, 213 Cal.App.4th 1076, the appellate court held that there was substantial evidence that it was "likely that [the defendant] will reoffend by engaging in sexually violent acts." (*Id*. at p. 1090.) It noted that two experts had "expressed their opinion that McCloud's paraphilia NOS [i.e., not otherwise specified] affected his volitional capacity and predisposed him to commit sexually violent acts. McCloud's difficulty controlling his behavior was evidenced by the fact that he had committed rapes in the past, had been sanctioned with long term imprisonment, and had nevertheless reoffended shortly after his release. McCloud's [antisocial personality disorder] also impaired his volitional capacity, making him more impulsive and therefore

more likely to act on his paraphilic urges." (*Ibid.*) The experts also "explained that paraphilia NOS is chronic and generally does not abate without intervention." (*Ibid.*)

Defendant's claim that the evidence showed at most a 13 percent chance of reoffending ignores much of the record. Dr. Vorwerk testified that, because defendant was in the high-risk/high needs group, his Static-99R score of zero meant that he had a 13 percent chance of reoffending in ten years. She added, however, that this meant that, 95 percent of the time, his actual risk of reoffense would be somewhere between 7.9 and 20.5 percent.

Dr. Vorwerk also testified that the Static-99R underestimated the actual risk. It systematically underestimates recidivism, in that some new sex crimes go unreported or unsolved.[8] While there was some evidence that it may, in other ways, systematically overestimate recidivism, the jury was free to put less weight on this evidence.

Moreover, Dr. Vorwerk testified that defendant's individual risk was higher than the Static-99R would indicate. He suffered from emotional impairment, which meant that he did not understand that he was causing someone harm. He also suffered from volitional impairment, meaning serious difficulty controlling his behavior. His particular mental disorders — Pedophilic Disorder and Antisocial Personality Disorder — were chronic and resistant to treatment. In any event, he was only in the beginning stages of

---

**8** In his reply brief, defendant argues that the jury could not consider this systematic underestimation unless there was evidence of the percentage of new unsolved sex crimes that were committed by recidivists. Not so. One need only assume this percentage is not zero — a reasonable assumption.

sex offender treatment, and he was shunning ancillary treatment for distorted thinking, cognitive impairment, coping skills, empathy, and anger management. He had had no release plan. He lacked insight. Dr. Vorwerk also considered his substance abuse, number of criminal sexual acts, betrayal of a victim's trust, and uncharged violence.

Dr. Brook relied on both the Static-99R and the Static-2002R. Defendant's score on the latter was higher; Dr. Brook testified that it represented average risk, although he did not quantify that. Like Dr. Vorwerk, he testified that defendant's individual risk was higher than these tests indicated, and for many of the same reasons. Defendant was emotionally impaired and volitionally impaired. Both of his mental disorders were chronic. He had not completed either sexual offender treatment or ancillary treatment. Defendant's "intimacy deficits" also made him more likely to reoffend.

Summing up, Dr. Brook testified that defendant was likely to reoffend because: "[H]e has committed multiple crimes multiple times, committed them again at a much later age, despite knowing what the consequences could be, his lack of empathy for his victims, his lack of acknowledgment for giving different stories for the first set of crimes, his complete absolute denial of the second set of crimes, his unpredictability in the open community in terms of following normal conventions and societal expectations, as well as some legal expectations."

This expert testimony not only paralleled that in *McCloud*, but went far beyond it. It provided ample grounds to conclude that defendant's actual risk was much greater than the 7.9 to 20.5 percent that his Static-99R score indicated.

45

In a subsidiary contention, defendant also argues that, if he can be found to be an SVP based on a 13 percent probability of reoffending, then the Act violates due process, because it is not narrowly tailored to a compelling state interest. We need not reach this argument, because the evidence here showed that defendant's actual risk, although not quantified (and probably not quantifiable), was well above 13 percent.

B.      *The Sufficiency of the Evidence of a "Well-Founded" Risk*

        *That Defendant Would Reoffend.*

Defendant contends that there was insufficient evidence of a "well-founded" risk that he would commit sexually violent crimes if released from custody. He points out that his score of zero on the Static-99R indicated below-average risk. As discussed in part IV.A, *ant*e, both prosecution experts opined that he presented a greater risk than his Static-99R score would suggest. Defendant argues, however, that these opinions lacked foundation, for multiple reasons.

The governing rule is that "'[t]he credibility and weight of the expert testimony was for the jury to determine, and it is not up to us to reevaluate it.' [Citation.]" (*People v. Garcia* (2020) 46 Cal.App.5th 123, 174.) As long as it was not speculative or lacking foundation, it constituted substantial evidence. (See *People v. Wright* (2016) 4 Cal.App.5th 537, 545.)

        1.      *Foundation for using a given factor to increase risk.*

Defendant argues that an expert could not use a given factor (e.g., his relationship issues) to increase his risk, in the absence of evidence that that factor was "unusual" or

46

"generally lacking" in the Static-99R sample. He also argues that an expert could not use a factor to increase his risk unless there was evidence that it was "highly correlated" with an increased risk.

While such evidence might have made the prosecution experts' opinions even more credible, it was not required.

The prosecution experts' opinion that defendant presented more risk than his Static-99R score alone would indicate could have been based on three different kinds of factors: (1) factors that had been statistically shown to be predictive; (2) factors that had been statistically shown to be *not* predictive; and (3) factors that had no statistical support either way. We will discuss these seriatim.

### a. *Factors statistically shown to be predictive.*

Dr. Vorwerk relied on the fact that defendant's score on the SRA-FV placed him in the high-risk/high-needs group. The Static-99R had been applied to two different sample groups, the routine group and the high-risk/high-needs group; it had been shown that, if a member of the routine group and a member of the high-risk/high-needs group both had a score of zero, the latter was roughly two and a half times more likely to reoffend.

Defendant complains about a long list of factors on which Dr. Vorwerk relied.[9] Dr. Vorwerk testified, however, that she considered each of these factors because they

---

[9] Specifically, "aggression, relational issues," "how many child victims appellant had, appellant's diagnosis of pedophilic disorder, the fact that appellant 'had a lot of sexual contacts per day back in the '80's,' appellant's 'sexualized violence,' 'how

47

were relevant under the SRA-FV. And the SRA-FV was relevant to whether defendant fell in the high-risk/high-needs group, which in turn was relevant to his risk of reoffending.[10]

Dr. Vorwerk also based her opinion on the fact that defendant's hypersexuality had not changed, there was no evidence that he was less attracted to children, and that his medical conditions would not prevent him from being aggressive and sexually active. However, she did not use these factors to *increase* his risk above his Static-99R results; rather, she used them to show that he had *no protective factors* that would *reduce* his risk below his Static-99R results. Thus, defendant's argument that most sex offenders in the Static-99R sample probably also had no medical condition that would prevent them from being sexually active is off the mark.

---

his daughters endured beatings with belts and paddles,' how appellant 'had naked pictures of his daughters,' 'as well as the pornographic magazines and videos,' appellant's 'rules violations in state prison for possession of pornography,' and 'that in his early 50's, he even had sex with his in-home healthcare provider'"; "'[i]s the person able to have long-term relationships in terms of a romantic partner? Was it a caring, loving, inmate [sic] relationship, or was it abusive and had a lot of problems between . . . the partners?'"; and "that appellant 'has issues about feeling wronged by others and externalizing blame, not taking responsibility for his offenses and for his behavior in the hospital.'"

[10] Defendant argues that the SRA-FV cannot show a "well-founded" risk. He argues that it was based on a study of a single sample, and that the researchers who developed the Static-99R decided not to use that sample. Dr. Vorwerk conceded that there were "issues" as to whether the results of the study "can be generalized to modern SVP[s]" and that this was a "limitation" of the SRA-FV. Nevertheless, she evidently considered the SRA-FV reliable, and we cannot say that she was wrong as a matter of law. This is a factual argument for a jury, not a legal argument for a court.

Like Dr. Vorwerk, Dr. Brook also relied on statistically validated factors extrinsic to the Static-99R. He cited two factors that were not in the Static-99R but were in the Static-2002R: having at least two victims under 12, at least one of which is unrelated to the perpetrator; and community supervision violations.

b. *Factors statistically shown to be not predictive.*

The experts were unanimous that studies showed that four factors did *not* increase risk: (1) denial of the offense, (2) minimizing culpability, (3) lack of empathy with the victim, and (4) lack of motivation for treatment. Defendant claims that the prosecution experts nevertheless relied on these factors.

He points to Dr. Vorwerk's testimony that defendant's psychopathy gave her "concern" about his risk of reoffending because "he does not feel any guilt or remorse for offending against others. There's no learned consequence of not doing it again. He does not have remorse or any sort of empathy about reoffending . . . ." While this did refer to empathy, in passing, empathy was not central. Dr. Vorwerk could properly rely on defendant's psychopathy because it involved lack of guilt, remorse, and inability to learn from consequences. Unlike empathy, there was no evidence that these — or psychopathy as a whole — were not predictive factors.[11]

---

[11] Defendant claims Dr. Vorwerk testified that there was no correlation between remorse and likelihood of reoffending. Not so. She was asked: "[O]bviously it's good to have remorse[,] regret and empathy but . . . *low victim empathy* is not related to reoffending sexually, right?" (Italics added.) She agreed. This question did not actually ask about remorse, which is different from victim empathy.

Defendant also complains that Dr. Vorwerk considered defendant "'externalizing blame, not taking responsibility for his offenses and for his behavior in the hospital.'" As he points out, the experts agreed that the denial of a sex offense was not a risk factor. However, it is one thing to deny a sex offense, and another thing to externalize the blame for it — i.e., to admit committing it, but to blame someone or something else. Moreover, defendant had a pattern of externalizing blame, not just for the sex offenses, but for his every failing. Dr. Vorwerk testified that this pattern was relevant under the SRA-FV; her testimony was not contradictory.

Admittedly, Dr. Brook did rely, in part, on two of these factors — lack of empathy and denial. He admitted that a study had found that they were not correlated with increased risk. He implied, however, that he disagreed with (or at least was not convinced by) the study. Thus, his testimony was not internally inconsistent.

Most important, even assuming he did contradict himself on this point, there was still ample evidence that defendant had a greater risk of reoffending than his Static-99R score would suggest. One could throw out all of Dr. Brook's testimony, yet still come to that conclusion based on Dr. Vorwerk's testimony. Or one could throw out his reliance on lack of empathy and denial, yet still accept his ultimate opinion.

   c.  *Factors not statistically supported.*

Both experts considered some factors that (at least as far as the record shows) had never been statistically assessed. Dr. Vorwerk considered psychopathy, substance abuse, number of criminal sexual acts, betrayal of a victim's trust, uncharged violence, and lack

50

of insight. Dr. Brook considered the commission of multiple sex crimes, reoffending "at a much later age, despite knowing what the consequences could be," giving conflicting accounts of the crimes, and "unpredictability" in following conventional community expectations.

We recognize that "[a]n expert's opinion is only as good as the facts upon which his or her opinion is based." (*In re Welch* (2015) 61 Cal.4th 489, 510.) However, "[a] physician is not required to personally replicate all medical experiments dating back to the time of Galen in order to relate generally accepted medical knowledge that will assist the jury in deciding the case at hand. An expert's testimony as to information generally accepted in the expert's area, or supported by his own experience, may usually be admitted to provide specialized context the jury will need to resolve an issue." (*People v. Sanchez* (2016) 63 Cal.4th 665, 675.)

Both prosecution experts were experienced SVP evaluators. Based solely on their training and experience, they could form a valid opinion that (1) the average sex offender is not a psychopath, and (2) a sex offender who is also a psychopath is more likely to reoffend. This would not necessarily have to be shown by a randomized, well-controlled statistical study. By way of analogy, a doctor can form the valid opinion that a certain drug is appropriate for an off-label use, even though that use has never been formally studied. Certainly either opinion would be more persuasive if it were supported by a study. And certainly either expert could be cross-examined about the basis for the opinion. Defense experts could even testify that a given factor had not been statistically

51

validated. The absence of a study, however, goes to the weight, not the admissibility of the opinion.

Defendant argues: "Given the years of study that have gone into the identification of those sexual offenders who are likely to reoffend, the thousands of sex offenders who have been studied, and the many factors considered, it would be quite surprising that factors of such powerful predictive value had not been discussed and included in the Static-99R." (Citation omitted.) That may a good argument to make to a jury, but the experts' opinions are still substantial evidence.

Defendant's argument that a factor cannot be used to increase risk unless it has been shown to be "generally lacking" in the Static-99R sample is mathematically unfounded. Even if (1) substance abuse increases risk, and (2) 99 percent of the members of the sample were substance abusers, defendant himself was 100 percent a substance abuser. Thus, it would still follow that his substance abuse increased his risk over that of the sample — although only a tiny bit. The fewer members of the sample who were substance abusers, the more it increased defendant's risk. An experienced SVP evaluator might have a sound clinical sense that substance abuse is not so prevalent among sex offenders as to be useless in identifying higher-risk sex offenders.

2.      *The propriety of using clinical judgment.*

Defendant argues that the evidence showed that it was inappropriate to depart from the Static-99R based on clinical judgment.

52

Dr. Vorwerk agreed that "the history of risk assessment is replete with examples in which actuarial procedures outperform unstructured professional judgment." However, she did not concede that this was one of those examples. This is another argument that would be better made to a jury. A qualified expert SVP evaluator's clinical judgment regarding an SVP's level of risk is nevertheless substantial evidence.

She also testified: "[A]nytime you are overriding what a score is, that is less reliable than if you're going with what the score says." But she added: "[I]n the case [of] Mr. Grimes, he did get a score of 0. There was no overriding that or throwing that out." Plainly, by "overriding," she meant changing the Static-99R numerical score; she did not mean departing from the Static-99R's resulting estimated level of risk.

### 3. *Reliance on the SRA-FV.*

Defendant challenges Dr. Vorwerk's reliance on the SRA-FV to place him in the high-needs/high risk group, citing her admission that "the ability of evaluators [t]o improve accuracy by choosing reference groups has yet to be empirically tested[.]" Actually, she was agreeing with an article that stated, "*Although we recommend the comprehensive evaluations, consider*[*ing*] *both reference groups*, the ability of evaluators [t]o improve accuracy by choosing reference groups has yet to be empirically tested[.]" (Italics added.) In other words, in the professional judgment of both Dr. Vorwerk and the author of the article, it was appropriate to consider the high-needs/high risk group, even in the absence of a formal study. Defendant's argument on this point is yet another factual argument better directed to a jury.

53

### 4. *Reliance on defendant's sexual abuse of R. and H.*

Defendant also criticizes Dr. Vorwerk's reliance on his 2002 conviction because she testified that there was no way to know whether he actually sexually abused R. and H. Her actual testimony on this point was: "There is no way for us to know. Only Mr. Grimes, sitting here today, knows whether that happened. *What I have is the police reports that both victims are reporting that he sexually abused them. We have his conviction that he's pleading guilty, in essence saying that he did it.* That's the information that I have to work with to make my assessment." (Italics added.) Defense expert Dr. Jeko agreed that she had to assume the 2002 sexual abuse actually occurred.

Defendant is raising the old epistemological quibble, "Can we ever really know anything?" The answer is that Dr. Vorwerk could know well enough to render an expert opinion, and the jury could know well enough to decide whether to accept her opinion.

### 5. *Reversing the burden of proof.*

Defendant criticizes Dr. Vorwerk's opinion that he was currently "hypersexual" because it was based on his conduct in 1989. She added that "[w]e have no objective measures that have shown that his sexual attractions towards children have gone down." Defendant characterizes this as reversing the burden of proof. However, it is a "permissible inference that a condition established to have existed at one point in time continues as long as is usual with things of that nature. [Citations.]" (*People v. Glover* (1967) 257 Cal.App.2d 502, 512.) Defendant failed to rebut this inference.

6.    *Reliance on past dynamic factors*.

Defendant argues that Dr. Vorwerk could not properly consider a dynamic factor without recent evidence of that factor.  He complains that Dr. Vorwerk considered the fact that his relationship with his wife and children was abusive, even though he had not lived with them since 1989, and how many child victims he had, even though he had not had any child victims since 2002.

A dynamic factor is one that can change over time.  This does not mean that it must have changed over time.  If defendant had had a sixth child victim since 2002, surely Dr. Vorwerk would have considered that.  The fact that he had not, however, did not preclude her from considering the fact that he had had five child victims.

We also note that, even assuming she mislabeled a factor as dynamic when it was actually static, that would not preclude her from considering it.  The distinction is not nearly as black and white as it might seem.  For example, the Static-99R takes into account the subject's present age, even though this, by definition, changes over time.  In any event, Dr. Vorwerk could reasonably opine that a given static factor was relevant, even though it was not reflected in the Static-99R.

C.    *The Sufficiency of the Evidence That Defendant Was Likely to Commit a "Predatory" Sexual Offense*.

Defendant contends that there was insufficient evidence that any future sexually violent criminal behavior in which he was likely to engage would be predatory.

55

All four experts diagnosed defendant as having Pedophilic Disorder. In addition, he was "extremely hypersexual" and "sexually preoccupied." His past offenses suggested that he was opportunistic. When his wife would not give him oral sex, he turned to his daughters, because they were available. Likewise, he victimized H., R., and his wife's sister because they were available. As defendant puts it himself, "he targeted children he knew, children who were otherwise available." To give him his due, there was no evidence that he was likely to target children who were strangers to him.

But if he were released, the only children who would likely be available to him would be casual acquaintances, like R. and H.,[12] or children with whom he cultivated a relationship for sexual purposes. If there were any children in his family, presumably they would be protected from him. If he formed a substantial relationship with a woman who had children, it would be hard for her to remain unaware that he was a sex offender, given the strict parole conditions to which he would be subject. Accordingly, he was likely to engage in sexually violent criminal behavior that would be predatory.

D. *The Sufficiency of the Evidence of a "Current"*

*Serious Difficulty in Controlling Behavior*.

Defendant contends that there was insufficient evidence that he had a "current" serious difficulty in controlling his sexually violent criminal behavior.

---

[12] Defendant asserts (although not under a separate heading) that there was insufficient evidence that R. and H. were casual acquaintances. However, as we held in part III.E, *ante*, they were casual acquaintances as a matter of law.

"[T]he [Act] requires a *current* diagnosis of a mental disorder and a finding that the committee is *currently* dangerous because he is likely to engage in sexually violent conduct in the future. [Citations.]" (*People v. LaBlanc* (2015) 238 Cal.App.4th 1059, 1075, italics added.)

Defendant argues that evaluations, reports, or findings from several years before trial are not sufficient evidence. (E.g., *Peters v. Superior Court* (2000) 79 Cal.App.4th 845, 850.) That is beside the point. All four experts evaluated defendant shortly before trial and diagnosed him as having two current mental disorders: Pedophilic Disorder, plus either Antisocial Personality Disorder or Adjustment Disorder.

Their evaluations were based, in part, on recent interviews with defendant, which showed that his Pedophilic Disorder was still current. For example, he told Dr. Vorwerk he wanted to "pop [his daughter's] cherry," while "laughing and smirking." He also admitted seeing child pornography while in the hospital and even putting a child pornography video into his video player.[13] Meanwhile, Dr. Vorwerk also administered the PCL-R, which showed a current "high degree of psychopathy."

According to Dr. Vorwerk, Pedophilic Disorder is not curable. It is "treatable with rigorous, intensive treatment over a long period of time, with the person engaging in that

---

[13]     Defendant argues that this was not evidence of pedophilic behavior, because: (1) "[e]xposure to such pornography may be inevitable in a hospital that houses [SVPs]"; (2) "[t]here was no evidence that appellant watched the video"; and "[t]here was no evidence that appellant was written up for this . . . ." Even if child pornography is "floating around," you don't have to put it in your own personal video player. Whether he was written up is irrelevant.

treatment." Similarly, Antisocial Personality Disorder "is chronic, enduring, and it just doesn't go away unless you're in rigorous treatment and desiring to change." Defendant, however, had been in sex offender treatment only off and on, and only for two years. He was in "the beginning stage of treatment." These facts supported the opinions that he had a current mental disorder.

Defendant also argues that there was "no substantial evidence of pedophilia" since 2002. This is essentially an argument that he had not engaged in any pedophilic *behavior* since 2002. However, from 2004 through 2016, he had been in prison, and since 2016, he had been committed to a state mental hospital. In other words, he had not had the opportunity to act on his pedophilic urges. The Act specifically provides that "'[d]anger to the health and safety of others' does not require proof of a recent overt act while the offender is in custody." (Welf. & Inst. Code, § 6600, subd. (d); see also *People v. Felix* (2008) 169 Cal.App.4th 607, 618-621 [due process does not require proof of a recent overt act while in custody].)

Defendant asserts: "A condition that is current, intense and manifest by a lack of self-control is, by definition, hard to hide. If, in addition, it is chronic, then over an extended period of time one would expect it to manifest repeatedly. Over a period of 16 years, if appellant truly had a condition that was 'recurrent' and 'intense' in the way that pedophilic disorder is described to be, then one would expect to see more than an occasional manifestation of it."

Defendant's attitude toward "popping [his daughter's] cherry" and his possession of child pornography were both recent manifestations of pedophilic behavior. In any event, as to a person who is in prison or a mental hospital, the lack of access to children severely limits the possibilities of manifesting pedophilic behavior. We conclude that, because defendant had been institutionalized for a very long time, evidence of recent pedophilic behavior was not absolutely required. His current diagnoses, when combined with the evidence that these diagnoses are chronic, and that defendant was only beginning treatment, were sufficient to support the prosecution experts' opinions that he had a current serious difficulty in controlling his behavior.

Defendant cites *People v. Buffington* (1999) 74 Cal.App.4th 1149, in which the defendant argued that the Act violated equal protection because, unlike other civil commitment schemes, it did not require any current psychological symptoms or any recent overt act. (*Id*. at p. 1159.) The court held that the Act does, in fact, require "'current psychological symptoms,'" "'recent objective indicia of the defendant's condition,'" and "a 'recent objective basis for a finding that an inmate is likely to reoffend.'" (*Id*. at p. 1161.) It relied on the fact that the Act provides for current psychological evaluations before trial, in which the issue is whether the defendant is presently mentally disordered and dangerous, culminating in "a full-blown trial as to whether the requirements for classification as an SVP have been established 'beyond a reasonable doubt.' [Citations.]" (*Id*. at p. 1160.) Finally, it held that the other civil commitment schemes did not, in fact, require a recent overt act. (*Id*. at p. 1162.)

59

In other words, *Buffington* recognized that the Act applies only to a defendant who has a current mental disorder and who is currently dangerous; nevertheless, it held that no recent overt act is required. The requirement of "current psychological symptoms," "recent objective indicia" and a "recent objective basis" can be satisfied by recent psychological evaluations of the defendant's current mental state. And these may be based on past behavior, if prevailing psychological standards permit. *Buffington* says nothing to the contrary. Any requirement of recent pathological *behavior* would conflict with the Act's provision — which *Buffington* confirmed — that no recent overt act is required.

*People v. Poe* (1999) 74 Cal.App.4th 826 is consistent with our reading of *Buffington*. It held that the Act "require[s] a 'recent objective basis' for commitment in the form of the determination of two experts, credited by the trier of fact, that 'a subject presently suffers from a mental disorder which predisposes him to commit further sexually violent predatory crimes' . . . ." (*Id*. at p. 833.) Such a "recent objective basis" can exist without any recent pathological behavior.

V

REFUSAL TO GIVE A PINPOINT INSTRUCTION REQUIRING "SERIOUS
DIFFICULTY" IN CONTROLLING SEXUALLY VIOLENT BEHAVIOR

Defendant contends that the trial court erred by refusing to give a pinpoint instruction to the effect that, for the jury to find that he was an SVP, "[defendant's]

60

diagnosed mental disorder must cause [him] to have serious difficulty controlling his sexually violent behavior . . . ."

A.      *Additional Factual and Procedural Background.*

CALCRIM No. 3454, as ultimately given in this case, states that the People must prove, among other things, that the defendant "has a diagnosed mental disorder" and that "[a]s a result of that diagnosed mental disorder, he is a danger to the health and safety of others because it is likely that he will engage in sexually violent predatory criminal behavior." It also states: "The term 'diagnosed mental disorder' includes conditions . . . that affect a person's ability to control emotions and behavior and predispose that person to commit sexual acts to an extent that makes him . . . a menace to the health and safety of others."

Defense counsel's motion in limine No. 113 asked that this instruction be modified by adding a requirement that "[defendant's] diagnosed mental disorder must cause [him] to have serious difficulty controlling his sexually violent behavior . . . ." The trial court granted the motion.

After both sides had rested, the trial court and counsel discussed the proposed instructions. The proposed version of CALCRIM No. 3454 did not include the "serious difficulty" language that defense counsel had requested.

Defense counsel asked that the instruction be modified, but only to state that there had to be "much more than the mere possibility" that defendant would engage in sexually violent predatory criminal behavior. He commented, "I think it was actually in one of the

61

motions in limine, and I think your tentative ruling on that was that you would grant the motion." He specifically cited motion in limine No. 113. He then asked the trial court to postpone ruling on his request, so he could provide additional authority and so defendant could be present.

Two days later, the instructions conference resumed. At this point, the proposed instruction still did not include the "serious difficulty" language requested in the motion in limine; however, it did include the "much more than the mere possibility" language. The prosecutor said that she agreed with the modification. The trial court asked, "Anything else on the instructions at all that you'd like to discuss?" Defense counsel turned to a different issue.

B. *Discussion*.

1. *Forfeiture*.

The People argue that defendant forfeited his request by failing to renew it at the instructions conference.

Motions in limine are more typically used to raise evidentiary issues, rather than instructional issues. In the evidentiary context, a motion in limine is sufficient to preserve an issue for appeal if "(1) a specific legal ground for exclusion is advanced and subsequently raised on appeal; (2) the motion is directed to a particular, identifiable body of evidence; and (3) the motion is made at a time before or during trial when the trial judge can determine the evidentiary question in its appropriate context." (*People v. Morris* (1991) 53 Cal.3d 152, 190, disapproved on unrelated grounds in *People v.*

*Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.) Otherwise, the objection must be renewed when the evidence is offered at trial. (*Morris*, *supra*, at p. 190.)

Here, defendant requested the instruction for specific legal reasons, which are the same as he is raising on appeal. The request raised a question of law; it did not turn on the introduction of any particular evidence at trial. Thus, the trial court could make a final determination on it in limine. We conclude that the motion in limine was sufficient to preserve the request and that no further request was necessary.

These facts, however, raise an additional issue: invited error. "'The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest. If defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal.' [Citation.]" (*People v. Bailey* (2012) 54 Cal.4th 740, 753.) Defense counsel's statements at the instructions conference indicated that he no longer wanted the "serious difficulty" modification; he wanted only the "much more than the mere possibility" modification.

Admittedly, invited error "does not apply if defendant merely acquiesced in the absence of an instruction. [Citation.] 'The record must reflect that counsel had a deliberate tactical purpose.' [Citations.]" (*People v. Bell* (2019) 7 Cal.5th 70, 109.) However, such a tactical purpose is apparent from defense counsel's closing argument. In it, he focused the jury on defendant's statistical unlikelihood of reoffending and directed it away from defendant's ability to control himself.

Thus, defense counsel's theme was "Trust the numbers." He asked the jury to set aside any emotions aroused by defendant's character and actions, and to look instead at the cold hard statistics regarding defendant's possibility of reoffending. For example, he said: "[T]his is the most important part of the case — is Mr. Grimes a risk to reoffend? Is he likely to reoffend in a sexually violent way? That is what this case is all about." He referred again and again to the "much more than a mere possibility" language of the instruction. By contrast, he never argued that defendant lacked any "serious difficulty" controlling his behavior.

In accordance with this strategy, defense counsel summed up by saying: "Is Mr. Grimes a convicted child molester? Yes, that's true. Is Mr. Grimes a terrible father? Yes, that's true. Is Mr. Grimes a grumpy old man? Yes, that's true. But is Mr. Grimes likely to reoffend? No, that's not true. Is Mr. Grimes a serious and well-founded risk? No, it's not true."

The evidence that defendant had serious difficulty controlling his behavior, while perhaps not overwhelming, was likely to trigger the jury's negative emotions. Defendant's commission of loathsome sexual offenses against his own daughters was already significant evidence of lack of control. In addition, there was (1) the prosecution experts' testimony that he was volitionally impaired, (2) his reoffenses in 2002, and (3) his fiery temper. Accordingly, defense counsel's tactical decision was reasonable.

We therefore conclude that defendant's present contention is barred by invited error. If only out of an excess of caution, however, we also discuss it on the merits.

64

2.      *The merits*.

In an SVP proceeding, just as in a criminal case, "'[e]ven in the absence of a request, a trial court must instruct on general principles of law that are . . . necessary to the jury's understanding of the case.' [Citations.]" (*People v. Roberge*, *supra*, 29 Cal.4th at p. 988 [SVP proceeding].)  "Where the trial court fails to give a necessary jury instruction in an SVP[] trial, the error is reversible unless it is shown to be harmless beyond a reasonable doubt under the standard established in *Chapman v. California* (1967) 386 U.S. 18 . . . .  [Citation.]" (*People v. Fraser* (2006) 138 Cal.App.4th 1430, 1456.)

By contrast, "[p]inpoint instructions 'relate particular facts to a legal issue in the case or "pinpoint" the crux of a defendant's case, such as mistaken identification or alibi. [Citation.]" (*People v. Wilkins* (2013) 56 Cal.4th 333, 348.)  "[S]uch a pinpoint instruction does not involve a 'general principle of law' as that term is used in the cases that have imposed a sua sponte duty of instruction on the trial court." (*People v. Saille* (1991) 54 Cal.3d 1103, 1120.)  "While a court may well have a duty to give a 'pinpoint' instruction . . . , such 'pinpoint' instructions are not required to be given *sua sponte* and must be given only upon request."' [Citation.]" (*People v. Anderson* (2011) 51 Cal.4th 989, 996-997.)  If the trial court erroneously refuses to give a pinpoint instruction, "reversal is required only if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citation.]" (*People v. Wilkins*, *supra*, at p. 349.)

Defendant seems confused about this distinction. He repeatedly characterizes the "serious difficulty" modification that he requested as a "pinpoint instruction." However, he then argues that a serious difficulty in controlling one's sexually violent behavior is an "element" of SVP status. Finally, he argues that the asserted error should be reviewed under *Chapman*.

The modification was indeed a pinpoint instruction. In *People v. Williams* (2003) 31 Cal.4th 757, the California Supreme Court held that a trial court in an SVP proceeding is not required to instruct that the prosecution must prove that the defendant has serious difficulty controlling his or her behavior. (*Id*. at p. 777.) It explained: "By its express terms, the SVPA limits persons eligible for commitment to those few who have already been convicted of violent sexual offenses against multiple victims [citation], and who have 'diagnosed mental disorder[s]' [citation] 'affecting the emotional or volitional capacity' [citation] that 'predispose[] [them] to the commission of criminal sexual acts in a degree constituting [them] menace[s] to the health and safety of others' [citation], such that they are 'likely [to] engage in sexually violent criminal behavior' [citation]. This language inherently encompasses and conveys to a fact finder the requirement of a mental disorder that causes serious difficulty in controlling one's criminal sexual behavior. The SVPA's plain words thus suffice 'to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case.' [Citation.]" (*People v. Williams*, *supra*, 31 Cal.4th at pp. 759-760.)

66

Defendant argues that *Williams* is irreconcilable with the decision of the United States Supreme Court in *Kansas v. Crane* (2002) 534 U.S. 407.  The *Williams* court, however, considered *Crane* at length.  (*People v. Williams*, *supra*, 31 Cal.4th at pp. 754, 759, 769-778.)  It "conclude[d] that a commitment rendered under the plain language of the SVPA necessarily encompasses a determination of serious difficulty in controlling one's criminal sexual violence, as required by . . . *Crane* . . . .  Accordingly, separate instructions . . . on that issue are not constitutionally required . . . ." (*Id*. at p. 777, fn. omitted.)  We are bound by the California Supreme Court's interpretation of prior decisions of the United States Supreme Court.  (*Tanguilig v. Bloomingdale's, Inc.* (2016) 5 Cal.App.5th 665, 673; *People v. Madrid* (1992) 7 Cal.App.4th 1888, 1895.)

A trial court can refuse to give a pinpoint instruction if it is duplicative.  (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 499.)  Under *Williams*, the requirement that the prosecution must prove that defendant has serious difficulty controlling his or her behavior is already adequately conveyed by the standard instruction.  Accordingly, the trial court was not required to give defendant's proposed modification.  Moreover, because the standard instruction adequately conveyed this concept, defendant cannot show prejudice.  It is axiomatic that "'[w]e presume the jury understood and followed the court's instructions.' [Citation.]" (*People v. Erskine* (2019) 7 Cal.5th 279, 303.)

67

## VI

## DISPOSITION

The judgment is reversed, subject to the following conditions. "On remand, the trial court is directed to conduct an evidentiary hearing at which the People will have the opportunity to show that the differential statutory treatment of SVP's and NGI's discussed herein is justified. If the trial court determines the People have carried their burden to do so, it shall [reinstate] its [judgment]. If it determines the People have not carried their burden, the trial court shall conduct a new [trial] . . . to determine whether [defendant] is an SVP." (*People v. Flint* (2018) 22 Cal.App.5th 983, 1007.) In any such new trial, defendant's 1989 confession must be excluded, unless there is some applicable exception to *Miranda*'s exclusionary rule (e.g., *Harris v. New York* (1971) 401 U.S. 222, 226 [statement obtained in violation of *Miranda* is admissible to impeach the defendant]), in which case defendant will be free to argue that his confession was involuntary.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
                                             P. J.

We concur:

CODRINGTON
                   J.

SLOUGH
                   J.